**In re Richard W. PARKER, Debtor.**

**Jenee Marie Watson, Appellant,**

v.

**Richard W. Parker, Appellee.**

**BAP No. KS–00–066.**

**Bankruptcy No. 96–42822.**

United States Bankruptcy Appellate Panel of the Tenth Circuit.

July 13, 2001.

---

John Kurtz of Hubbard & Kurtz, L.L.P., Kansas City, MO, for Jenee Marie Watson, Appellant.

Richard W. Parker, pro se.

Before McFEELEY, Chief Judge, CLARK, and BOHANON, Bankruptcy Judges.

## OPINION

McFEELEY, Chief Judge.

Creditor, Jenee Watson ("Watson"), appeals an order of the United States Bankruptcy Court for the District of Kansas ("bankruptcy court") that permitted Richard W. Parker ("Debtor") to reopen his Chapter 7 case and amend his schedules to

include a legal malpractice claim Watson had against him ("Claim"). Watson argues that equitable doctrines should have prohibited the Debtor from reopening his Chapter 7 case. Alternatively, Watson contends that the Claim is nondischargeable as it arose post discharge. Finally, Watson argues that her Claim is nondischargeable under the provisions of 11 U.S.C. § 523(a)(2), (4), or (6).[1]

For the reasons stated below, we AFFIRM.

## I. Appellate Jurisdiction

■ The Bankruptcy Appellate Panel has jurisdiction over this appeal. The bankruptcy court's judgment disposed of the adversary proceeding on the merits and is a final order subject to appeal under 28 U.S.C. § 158(a)(1). *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). Watson timely filed her notice of appeal pursuant to Federal Rule of Bankruptcy Procedure 8002.[2] The parties have consented to this Court's jurisdiction by failing to elect to have the appeal heard by the United States District Court for the District of Kansas. 28 U.S.C. § 158(c)(1); Fed. R. Bankr.P. 8001; 10th Cir. BAP L.R. 8001–1.

## II. Standard of Review

"For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable de novo), questions of fact (reviewable for clear error), and matters of discretion (reviewable

---

1. Future references are to Title 11 of the United States Code unless otherwise noted.

2. The Debtor argues that this appeal is not properly before us as Watson has not presented us with "a statement of the reasons why an appeal should be granted" pursuant to Feder-

al Bankruptcy Rule 8003. Debtor has misread this rule. Such a statement is required only when an appellant makes a "motion for leave to appeal under 28 U.S.C. § 158(a)" an interlocutory order. Fed. R. Bankr.P. 8003. This appeal is of a final order.

for 'abuse of discretion')." *Pierce v. Underwood*, 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir. 1996).

▇▇▇ Whether a bankruptcy court properly reopened a bankruptcy case is reviewed under the abuse of discretion standard. *Nintendo Co., Ltd. v. Patten (In re Alpex Computer Corp.)*, 71 F.3d 353, 356 (10th Cir.1995). "A court abuses its discretion if it renders a decision that is 'arbitrary, capricious, whimsical, or manifestly unreasonable.'" *Phillips USA, Inc., v. Allflex USA, Inc.*, 77 F.3d 354, 357 (10th Cir.1996) (quoting *United States v. Robinson*, 39 F.3d 1115, 1116 (10th Cir.1994)). Questions of statutory interpretation are reviewed de novo. *Dalton v. Internal Revenue Service*, 77 F.3d 1297, 1299 (10th Cir.1996). When a bankruptcy court has made factual findings that a debt falls within a statutory exception to discharge and there is no dispute about the legal principles, we review the factual findings under the clearly erroneous standard. *Arkansas Aluminum Alloys, Inc. v. Joyner (In re Joyner)*, 132 B.R. 436, 438–39 (D.Kan.1991). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

### III. *Background*

Watson hired Debtor, at that time a practicing attorney, to represent her.

Around December 1, 1995, the Debtor filed a complaint on Watson's behalf in the United States District Court for the District of Kansas against Watson's former employer (hereinafter, "Federal Case"). On May 7, 1996, a federal magistrate issued a "Notice and Order to Show Cause" ("Show Cause Order") directing the Debtor to submit cause in a writing to the court before May 24, 1996, as to why the Federal Case should not be dismissed for failure to make service on the defendant within 120 days. The Debtor did not file a response to the Show Cause Order, and on May 31, 1996, the Federal Case was dismissed.

One day prior to the Show Cause Order, on May 6, 1996, the Debtor was arrested for DUI, possession of cocaine, resisting arrest, battery on a law enforcement officer, suspended driver's license, and other miscellaneous charges. On December 15, 1996, the Debtor was arrested on charges of battery and criminal trespass for his conduct in attempting to enter a private residence where a former girlfriend lived.[3]

On November 26, 1996, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code. The Debtor did not list Watson as a creditor. Debtor's case was administered as a "no asset" case, and on May 14, 1998, the Debtor received a discharge. Sometime later, the bankruptcy court closed Debtor's case.

Debtor admitted that he had committed malpractice in Watson's case in a letter dated December 24, 1996. On January 23, 1997, the Debtor filed a motion to reinstate the Federal Case,[4] and, in February, Watson terminated his employment.

---

3. The Supreme Court of Kansas temporarily suspended Debtor's license for eighteen months, commencing July 9, 1998, for these offenses as well as for the negligent practice of law in four separate complaints. Watson's complaint was not included in those proceedings. The Debtor's arrests are not substantively part of the basis of Watson's appeal.

4. On June 18, 1997, the federal court denied the Debtor's Motion to Reinstate.

Watson filed a malpractice lawsuit in state court against the Debtor on July 8, 1998. In the Debtor's Answer he asserted, as an affirmative defense, the discharge of Watson's Claim in bankruptcy. Subsequently, Watson deposed the Debtor on June 26, 1999. In his deposition testimony, the Debtor stated, "I made the conscious decision that I knew I had screwed up this case and I elected not to list her as a creditor so that she would have full rights to come after me." (Applt. Suppl. App. at 103). Following the Debtor's deposition, on September 22, 1999, Watson amended her lawsuit to include as defendants the attorneys she had retained after terminating the Debtor's services.

The Debtor filed a Motion to Reopen his Chapter 7 case on May 6, 2000, seeking to reopen the case to declare Watson's Claim discharged. Watson opposed the reopening of the case in Suggestions of Jenee Marie Watson in Opposition to Debtor Richard W. Parker's Motion to Reopen Case, arguing that laches and equitable estoppel applied and that she would be unfairly prejudiced if the case were reopened. Watson also maintained that her Claim was not discharged in the Debtor's Chapter 7 case and that she was entitled to nondischargeable punitive damages.

On October 5, 2000, the bankruptcy court filed an "Order Reopening the Case and Declaring the Debt Owed Jenee Marie Watson Discharged" ("Order"). In findings of fact and conclusions of law made on the record at two hearings, the bankruptcy court concluded that the only reason to reopen the case was to determine the dischargeability of Watson's Claim. The bankruptcy court found that there were only two issues in this case that would render Watson's claim nondischargeable: 1) whether under § 523(a)(3)(A) Watson

was prejudiced by the omission of her Claim from the Debtor's Chapter 7 schedules; 2) whether under § 523(a)(3)(B) the Debtor's malpractice was nondischargeable under §§ 523(a)(2), (4), or (6). The bankruptcy court held that neither of these sections applied.

Subsequently, the bankruptcy court's Order reopened the Debtor's Chapter 7 case and discharged Watson's Claim pursuant to § 727(b). The bankruptcy court granted Watson ten days from the entry of its Order to seek permission to present evidence that the claim was nondischargeable under § 523(a)(6) on the grounds that any malpractice the debtor committed was intentional or willful. Although Watson filed an untimely affidavit, which purported to offer such evidence, to which the Debtor filed a response, Watson never formally sought permission from the bankruptcy court as directed. Subsequently, the bankruptcy court's Order became final on October 8, 2000. This appeal followed.

## IV. *Discussion*

■ Watson argues that the court erred when it permitted the reopening of the Debtor's Chapter 7 case under § 350(b) of the Bankruptcy Code as the bankruptcy court did not consider the equitable doctrines of laches, estoppel, and clean hands, which, Watson contends, limit the statute. Pursuant to § 350(b): "A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b). The statute gives the bankruptcy court broad discretion in deciding whether to reopen the case.

■ Bankruptcy Rule 5010 delineates the procedure for reopening a case. Fed. R. Bankr.P. 5010.[5] Only a debtor, creditor

---

5. Rule 5010 provides:

A case may be reopened on motion of the

or trustee, has standing to move for the reopening of a case. *Alpex,* 71 F.3d at 356. Here, approximately two years after he received his discharge, the Debtor moved to reopen his Chapter 7 case to accord him relief from Watson's malpractice claim. Pursuant to Bankruptcy Rule 9024 a motion to reopen a case is not subject to the one year limitation that governs other motions.[6] However, bankruptcy courts have found that when an unreasonable delay has prejudiced the party opposing reopening, laches is a valid reason to deny motions to reopen. H.R.Rep. No. 95–595, at 338 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6294; S.Rep. No. 95–989, at 49 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5835 ("Though the court may permit reopening of a case so that the trustee may exercise an avoiding power, laches may constitute a bar to an action that has been delayed too long.").

■ Watson contends that both laches and/or equitable estoppel should bar the reopening of this case, alleging that the Debtor's failure to include her on his schedules caused her economic harm because of the litigation expenses of her Claim.

■ Generally, courts will apply the doctrine of laches when the following two elements are met: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). Courts employ equi-

table estoppel when all four prongs of the following test are met: 1) the party to be estopped is aware of the facts; 2) the party to be estopped intended its act or omission to be acted upon; 3) the party asserting estoppel did not have knowledge of the facts; and 4) the party asserting estoppel reasonably relied on the conduct of the other party to his or her substantial injury. *DePaolo v. United States (In re DePaolo),* 45 F.3d 373, 377 (10th Cir.1995). The evidence, Watson argues, establishes that she has met all elements of either test. She relies on *Calder v. Job (In re Calder),* 907 F.2d 953 (10th Cir.1990) (per curiam), to support her argument that the bankruptcy court erred when it reopened the Debtor's case.

In *Calder,* after filing a voluntary Chapter 7 case, a debtor proceeded through state court litigation to judgment with a creditor that he had omitted from his schedules. *Calder,* 907 F.2d at 954. Following judgment, the debtor claimed the protection of the automatic stay to defeat the judgment. The Tenth Circuit held that "equitable principles may, in some circumstances, be applicable to claimed violations of the stay." *Id.* at 956. Circumstances that trigger equitable considerations include those when "a creditor was without actual knowledge of a bankruptcy petition and the bankrupt's unreasonable behavior contributed to the creditor's plight." *Id.* The Court, thus, upheld the bankruptcy court's order allowing the creditor's proof of claim on the grounds

---

debtor or other party in interest pursuant to a § 350(b) of the Code. In a chapter 7, 12, or 13 case a trustee shall not be appointed by the United States trustee unless the court determines that a trustee is necessary to protect the interest of creditors and the debtor or to insure efficient administration of the case.

Fed. R. Bankr.P. 5010.

6. Rule 9024 provides:

Rule 60 F.R.Civ.P. applies in cases under the Code except that (1) a motion to reopen a case under the Code or for the reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to the one year limitation prescribed in Rule 60(b). . . .

Fed. R. Bankr.P. 9024.

that the Debtor "unreasonably delayed" informing the creditor of the automatic stay. *Id.*

The bankruptcy court found *Calder* distinguishable from this case because, unlike the creditor in *Calder*, Watson suffered no prejudice as required by laches or equitable estoppel. Because Watson's malpractice Claim is proceeding under a contingent fee contract against two separate defendants against whom only one recovery may be made, the bankruptcy court found that she has suffered no financial harm. The bankruptcy court reasoned that she would have incurred the expense of the Debtor's deposition regardless of whether she proceeded only against her other attorneys or all, including the Debtor. Similarly, other litigation expenses would be the same whether she proceeded against all defendants, including the Debtor, or the other defendants alone.

These findings are supported by the record. While there is evidence that the Debtor purposefully left Watson off his bankruptcy schedules,[7] there is no evidence that Watson relied on the Debtor's conduct to her substantial injury or that she has been prejudiced by the Debtor's failure to list her. In fact, before Watson took the Debtor's deposition, the Debtor made her aware of his contention that the Claim had been discharged in bankruptcy by asserting it as an affirmative defense in his Answer to her Complaint.

Alternatively, Watson argues that the bankruptcy court erred when it reopened the case under § 350(b) because a debtor's intent is germane to a court's inquiry pursuant to the "clean hands doctrine." Under the equitable clean hands

doctrine, a party will not be accorded relief when the unconscionable act of the one coming for relief "has immediate and necessary relation to the equity that [the party] seeks...." *Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933). Watson contends that the Debtor's deposition testimony that he purposefully omitted Watson from his schedules so that Watson could sue the Debtor for malpractice in state court was the unconscionable act that should have triggered the clean hands doctrine.

Courts are split on the issue of whether a debtor's intent in failing to schedule a claim is relevant in a court's decision whether to reopen a case under § 350(b) in no asset Chapter 7 cases when no claims bar date has been set. Some courts consider intent under the equitable clean hands doctrine, while other courts, following a mechanical approach, find that equitable principles do not apply. *See In re Cruz,* 254 B.R. 801, 807–08 (Bankr. S.D.N.Y.2000) (collecting cases).

Courts using the equitable approach in deciding whether to reopen a case under § 350(b) examine the circumstances surrounding the failure to list a certain creditor. These courts have found that motions to reopen should be granted unless the omission was the result of fraud or intention. *See, e.g., Stark v. St. Mary's Hospital (In re Stark),* 717 F.2d 322 (7th Cir. 1983) (per curiam); *Faden v. Ins. Co. of North America (In re Faden),* 96 F.3d 792, 797 (5th Cir.1996); *Samuel v. Baitcher (In re Baitcher),* 781 F.2d 1529, 1534 (11th Cir.1986). These courts often conclude that reopening the case will have an im-

---

7. Later, in a hearing before the bankruptcy court on March 20, 2000, the Debtor refuted his deposition testimony, arguing that at the time he filed his schedules, he had not known that Watson's case had been dismissed, Watson had not yet filed a malpractice claim against him, and she had not terminated his services. (Applt. App. at 24).

pact on the dischargeability of the debt. *See, e.g., Faden,* 96 F.3d at 797; *Baitcher,* 781 F.2d at 1534. Thus, the intent of the Debtor at the time of the omission is relevant to the inquiry.

In contrast, the majority of courts apply the mechanical approach. *Cruz,* 254 B.R. at 807. The Third, the Sixth, and the Ninth Circuits have held that pursuant to the plain language of the Bankruptcy Code the debt is discharged by operation of law and that to reopen a bankruptcy case to schedule a previously unlisted debt in a no asset, no bar date case has no effect on the dischargeability of the debt. *See, e.g., Zirnhelt v. Madaj (In re Madaj),* 149 F.3d 467, 471 (6th Cir.1998); *Judd v. Wolfe (In re Judd),* 78 F.3d 110, 115 (3d Cir.1996); *Beezley v. California Land Title Co. (In re Beezley),* 994 F.2d 1433 (9th Cir.1993) (per curiam). In this approach, intent is irrelevant.

The Tenth Circuit has not directly addressed this issue.[8]

Following *Madaj* and the majority approach, the bankruptcy court observed that the clean hands doctrine does not apply because the intent of the Debtor is irrelevant to any inquiry outside the exceptions given in § 523(a)(2), (4), and (6). Although the bankruptcy court had reopened the case, it observed that reopening the case was, in fact, unnecessary as explained in *Madaj* because the debt was dischargeable as it did not meet either of the exceptions delineated in § 523(a)(3)(A) or (B).

■■■■■ We agree. The mechanical approach is better reasoned and more faithful to the language of the Bankruptcy Code. Pursuant to § 727(b), the Debtor receives a discharge from all debts that arose before the date of the order for relief under Chapter 7, regardless of whether a proof of claim based on any such debt or liability is filed, unless an exception in 523(a) applies.[9] Under § 523(a)(3)(A),[10] a claim will not be dis-

8. In *Dawson v. Unruh, (In re Dawson),* 209 B.R. 246 (10th Cir. BAP 1997), we addressed whether a Chapter 7 debtor in a no asset case in which a claims bar date had been set could reopen the case to schedule an inadvertently omitted debt. We found that equitable considerations did not apply in that case because equitable considerations could not override the plain language of § 523(a)(3)(A), which states that a debt is nondischargeable if the creditor did not have notice so as to timely file a proof of claim. *Dawson,* 209 B.R. at 250. This case is distinguishable in that a notice of no dividend pursuant to 2002(e) was never given here, so there was no question as to the timeliness of the claim. *See Dawson,* 209 B.R. at 250 (finding that "[o]ur case is clearly distinguishable from cases in which a 'notice of no dividend' had been given."). More importantly, we did not directly address the question of whether equitable considerations apply in a court's consideration of whether to reopen a no asset, no claims bar date case and reschedule a debt when there are allegations that a debtor intentionally omitted a creditor. *Id.* (citing *Stark* for the proposition that "a debtor may reopen to add

an omitted creditor where there is no evidence of fraud or intentional design. . . .").

9. Section 727(b) provides:

Except as provided in section 523 of this title, a discharge under subsection (a) of this section discharges the debtor from all debts that arose before the date of the order for relief under this chapter, and any liability on a claim that is determined under section 502 of this title as if such claim had arisen before the commencement of the case, whether or not a proof of claim based on any such debt or liability is filed under section 501 of this title, and whether or not a claim based on any such debt or liability is allowed under section 502 of this title. 11 U.S.C. § 727(b).

10. Under this exception to discharge:

(a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt-

. . . .

(3) neither listed nor scheduled under section 521(1) of this title, with the name, if known

charged if it was neither listed nor scheduled and the creditor did not have notice or actual knowledge of the case so that the creditor could timely file a claim. Here the bankruptcy court correctly found that § 523(a)(3)(A) does not apply because the Debtor's Chapter 7 case was a no asset case with no claims bar date set; therefore, Watson had suffered no prejudice because Watson will have an opportunity to file a claim if any assets are discovered. Because § 523(a)(3)(A) does not apply, unless Watson can establish that the claim was nondischargeable under one of the exceptions referenced in § 523(a)(3)(B), her Claim was discharged by operation of law under § 727(b). We conclude that equitable considerations do not impact the dischargeability of a debt under § 523(a)(3)(A), and therefore, it was unnecessary to reopen the Debtor's Chapter 7 case for the purpose of making that determination. However, we find that the bankruptcy court did not abuse its discretion when it reopened the Debtor's case because the court conducted the right analysis.

■ Next, Watson contends that the bankruptcy court erred in concluding that her Claim was discharged, arguing that the Claim arose post-petition. This argument is based on a theory that a cause of action accrues at the same moment that the statute of limitations for bringing the suit begins to run.

■ Under Kansas law the statute of limitations for a cause of action for an attorney malpractice case begins to run under one of the following four circumstances:

(1) The occurrence rule-the statute begins to run at the occurrence of the lawyer's negligent act or omission.

(2) The damage rule-the client does not accrue a cause of action for malpractice until he suffers appreciable harm or actual damage as a consequence of his lawyer's conduct.

(3) The discovery rule-the statute does not begin to run until the client discovers, or reasonably should have discovered, the material facts essential to his cause of action against the attorney.

(4) The continuous representation rule-the client's cause of action does not occur until the attorney-client relationship is terminated.

*Gansert v. Corder,* 26 Kan.App.2d 151, 980 P.2d 1032, 1034 (1999) (quoting *Pancake House, Inc. v. Redmond,* 239 Kan. 83, 716 P.2d 575, 579 (1986)). Watson claims that under prongs two through four she did not have a cause of action until after the bankruptcy petition was filed. She argues that not only was she not cognizant of any legal malpractice until after the Debtor filed his Chapter 7 case, but she also continued to be represented by him; therefore, no legal cause of action accrued under state law until post-petition. Because § 727(b) provides only for a debtor's discharge "from all debts that arose before the date of the order for relief under this chapter," she contends that the bankruptcy court erred when it discharged her Claim.

The bankruptcy court held that § 101 of the Bankruptcy Code controls the issue of when a claim arises and that the Claim arose when the malpractice actually occurred. The issue of when a claim arises has been the subject of much debate

to the debtor, of the creditor to whom such debt is owed, in time to permit-
(A) if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection,

timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing. . . .
11 U.S.C. § 523(a)(3)(A).

among the courts. There are two views. One line of cases asserts that a claim arises only when there is an accrued cause of action under state law ("accrual theory"). *See, e.g., In re M. Frenville Co., Inc.,* 744 F.2d 332 (3d Cir.1984). Although this case is not cited by Watson, this appears to be the interpretation of § 101(5)(A) that she advocates.

In *Frenville,* an independent auditing firm employed an accounting firm, Avellina and Bienes ("A & B"), to prepare its financial statement. After the auditing firm filed a bankruptcy petition, several banks that had received its financial statement sued A & B on the ground that it had been negligently prepared. A & B moved for relief from the automatic stay so that it could bring in the auditing firm as a third party defendant for its indemnification. Focusing on the language "right to payment" in the Code definition of "claim," the court concluded that a "right to payment" must exist pre-petition before a claim can exist. Because the Bankruptcy Code does not define when a right to payment arises, the court turned to state law. It found that because A & B had no right pursuant to state law to seek indemnification before the banks filed suit, the claim arose post-petition and therefore was not barred by the automatic stay. Consequently, under the *Frenville* approach, a court must look to the state law under which liability for the claim arose to determine if there is a pre-petition claim.

*Frenville* is the minority view and has been heavily criticized by courts.[11] The cases rejecting this theory maintain that Congress intended the word "claim" to be read more broadly. *See, e.g., Grady v.*

*A.H. Robins Co., Inc.,* 839 F.2d 198 (4th Cir.1988). These courts have held that a claim arises at the time of the debtor's conduct that gives rise to the claim ("conduct theory"). *Id.* at 202–03; *In re Black,* 70 B.R. 645 (Bankr.D.Utah 1986). In *Grady,* a claimant who had used the Dalkon Shield sought stay relief for herself and all other future claimants to prove that her claim did not arise until after the filing of the Dalkon Shield manufacturer's bankruptcy case and therefore was a post-petition claim not subject to the automatic stay. Although under state law, the claim arose upon discovery, which occurred after the bankruptcy filing, the Fourth Circuit found that under the broad definition of the word "claim" in § 101(5), the claim arose when the conduct occurred that gave rise to the alleged liability. Because the Dalkon Shields had been manufactured prior to the filing of the bankruptcy case, as a matter of federal bankruptcy law, the claim arose pre-petition and was stayed by § 362. Under this approach, the timing of the debtor's conduct that gives rise to the cause of action determines whether the claim is pre or post-petition.

This issue has not been addressed by the Tenth Circuit. *See Franklin Sav. Ass'n v. Office of Thrift Supervision,* 31 F.3d 1020, 1022 (10th Cir.1994) (declining to rule on the issue).

■ We adopt the conduct theory. Pursuant to the plain language of the Bankruptcy Code as well as the policy underlying the Code, Watson's Claim arose at the time the Debtor committed the conduct on which the Claim is based.

■ A court, when interpreting a statute, must first examine the statutory

---

11. *See, e.g., In re Amfesco Industries, Inc.,* 81 B.R. 777, 782 n. 3 (Bankr.E.D.N.Y.1988) (observing that the Frenville court's "focus on the 'right to payment' as defined by applicable state law limits the definition of a claim to be

a matured right to payment ... and is therefore inapposite to the meaning of 'claim' intended by Congress. The question of whether a claim exists should ultimately be determined under federal bankruptcy law.").

language. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). While under the Bankruptcy Code, "property interests are created and defined through state law," *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979), the terms "creditors" and "claim" are explicitly defined by federal law in the Bankruptcy Code. Under § 101, a creditor is an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor...." 11 U.S.C. § 101(10)(A). Pursuant to § 101(5), a claim includes the following:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured....

11 U.S.C. § 101(5)(A). In the Code's definition of the term "claim," the pivotal word, for our purposes, is the term "contingent." "If unambiguous statutory language is not defined, we give that language its common meaning, provided that the result is not absurd or contrary to the legislative purpose." *Dalton*, 77 F.3d at 1299 (citing *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.)*, 4 F.3d 1556, 1564 (10th Cir.1993)). As defined by Black's Law Dictionary, a contingent claim is "[o]ne which has not ac-

crued and which is dependant on some future event that may never happen." *Black's Law Dictionary* 290 (5th ed.1979). Because the Bankruptcy Code expressly delineates the boundaries of the term claim, the issue of whether a claim is valid under state law is not the primary inquiry for a bankruptcy court when determining whether a claim against a debtor is a bankruptcy claim under the Code. The central issue for a bankruptcy court is whether a claim as defined by the Bankruptcy Code existed pre-petition. We find that pursuant to the plain language of the statute, a claim will exist if some pre-petition conduct has occurred that will give rise to liability.[12]

Notably, the conduct approach is also consistent with the policy behind the Code. Legislative history indicates that Congress intended the broadest possible definition of the term "claim." As detailed in the Historical and Revision Notes, the definition of the word "claim," was meant to be:

a · significant departure from present law.... By this broadest possible definition, and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broad-

---

**12.** Still another line of cases rejecting the accrual theory has narrowed the conduct theory ("narrow conduct test"). These courts have found that a claim arises at the time of the conduct upon which the debtor's liability is based only if the claimant had a specific relationship with the debtor at the time the conduct occurred. *In re Piper Aircraft Corp.*, 162 B.R. 619 (Bankr.S.D.Fla.), *aff'd sub nom. Epstein v. Official Comm. of Unsecured Creditors of Estate of Piper Aircraft Corp.*, 168 B.R. 434 (S.D.Fla.1994), *aff'd*, 58 F.3d 1573 (11th Cir.1995); *see also California Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925,

930–31 (9th Cir.1993) (holding that a "claim" will arise under the Code only when there is a pre-petition relationship between the claimant and the debtor and adding the requirement that the "claim" be within the "fair contemplation of the parties" at the time of the bankruptcy); *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1277–78 (5th Cir.1994) (following *Piper* and *Jensen* ). Because the attorney/client relationship between the two parties here would meet the criteria of either test, we do not reject this line of cases, nor will we speculate in this case on whether the conduct theory should be so narrowed.

est possible relief in the bankruptcy court.

S.Rep. No. 95–989, at 21–22 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; *see also Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) (finding that Congress intended to adopt the broadest available definition of the term "claim"). Previously, under § 63 of the Bankruptcy Act, the term "claim" was modified by "provability" in order "to limit the kinds of debts that were payable in a bankruptcy case." *Mooney Aircraft Corp. v. Foster (In re Mooney Aircraft, Inc.)*, 730 F.2d 367, 375 n. 6 (5th Cir.1984). However, as indicated above, the new, expansive definition of the word "claim" was meant to help the debtor achieve a "fresh · start," the philosophy that animates the current Bankruptcy Code.

Here, Watson's Claim involves legal representation that occurred pre-petition. Regardless of when the Kansas statute of limitations began to run, Watson had a contingent claim against the Debtor at the moment the Debtor engaged in the conduct that formed the basis for malpractice liability. As established by the record, the malpractice occurred in May 1996, when the Debtor failed to respond to the Show Cause Order, resulting in the dismissal of the Federal Case. At that time, at a minimum, Watson had a contingent pre-petition claim against Debtor. When in November 1996, the Debtor filed under Chapter 7 of the Bankruptcy Code, this Claim was a claim against the Debtor's bankruptcy estate.

██ Watson then argues that the bankruptcy court erred when it found the Claim discharged as the Claim was nondischargeable pursuant to § 523(a)(3)(B), which provides that a debt will be nondischargeable if the debt meets the following criteria:

(3) [the debt was] neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

. . . .

(B) if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

11 U.S.C. § 523(a)(3)(B). If Watson's Claim was nondischargeable under § 523(a)(2), (4), or (6), then her Claim would be nondischargeable pursuant to § 523(a)(3)(B) as it is uncontested that she had no notice of the Debtor's Chapter 7 case in time to permit her to timely file a proof of claim and request a determination of dischargeability. In order to prevail under this section, Watson bore the burden of proving that her Claim was nondischargeable under § 523(a) by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

██ First, Watson contends that an agreement to provide legal services is enough to meet the criteria of either § 523(a)(2) or (4). Watson bases this argument on the premise that a promise to supply legal services and a failure to do so resulting in malpractice is equivalent to false representation, false pretense, actual fraud, or defalcation.

██ Under § 523(a)(2), a debtor will not be discharged from any debt "for money, property, [or] services . . . to the extent obtained by—(A) false pretenses, a

false representation, or actual fraud...." 11 U.S.C. § 523(a)(2)(A). Under this section "false pretenses" or "representations" are representations knowingly and fraudulently made that give rise to the debt. *Driggs v. Black (In re Black)*, 787 F.2d 503, 505 (10th Cir.1986). The term "fraud" as used in § 523(a)(2)(A) means actual or positive fraud rather than fraud implied by law. *Id.* (finding that under § 523(a)(2)(A) the term "fraud" "includes only those frauds involving moral turpitude or intentional wrong, and does not extend to fraud implied in law which may arise in the absence of bad faith or immorality."); *see also Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 786–87 (10th Cir. BAP 1998).

The bankruptcy court found that there was no evidence of fraud under § 523(a)(2)(A) so as to render Watson's Claim nondischargeable. Watson alleges that the bankruptcy court erred on the ground that this case is like *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367 (10th Cir.1996). Watson argues that a failure to keep a client informed about the progress of the case is tantamount to fraud.

In *Young*, an attorney had an unwritten financial agreement with a client whereby monies they owed each other for construction and legal services would be credited to or deducted from one another's account. Later, the attorney signed a promissory note evidencing debt to the client. The attorney did not advise the client to obtain outside counsel before entering into such an agreement, nor had the attorney disclosed any possible conflict of interest in such an exchange of services. Subse-

quently, the attorney filed for bankruptcy under Chapter 7. The Tenth Circuit found that the attorney/debtor's failure to disclose to the creditor the terms of their financial agreement in writing as well as potential conflicts of interest involved in their agreement as mandated by the New Mexico Rules of Professional Conduct were false representations within the meaning of § 523(a)(2)(A) and remanded the case to the bankruptcy court for findings as to whether the debtor's misrepresentations were made with the intent to deceive the creditor so as to render the debt nondischargeable under § 523(a)(2).

Here, Watson contends that this case is like *Young* because the Model Rules of Professional Conduct in Kansas impose the following duties on an attorney: to keep a client reasonably informed about a matter, to explain a matter to a client so that a client may make informed decisions, and to act with reasonable diligence and promptness in representing a client. Kan. Ct. R. 226, Kan. R. Prof. Conduct 1.3, 1.4(a), (b).[13] The bankruptcy court found that *Young* was distinguishable on the ground that the finding in *Young* was that a failure to disclose was equivalent in that case to an intent to deceive. In contrast, in this case, there was no intent to deceive.

We agree. While the Debtor did not keep Watson informed about the status of the Federal Case, there was no evidence proffered showing that the Debtor made any false representations about its status with the intent to deceive Watson. Additionally, there was no evidence that the Debtor knowingly entered into an attor-

---

13. Kansas Rule of Professional Conduct 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." Kan. Ct. R. 226, Kan. R. Prof. Conduct 1.3. Pursuant to Rule 1.4:

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Kan. Ct. R. 226, Kan. R. Prof. Conduct 1.4.

ney/client relationship with Watson with the intent not to represent her to the best of his abilities. Rather, the evidence in the record indicates that the Debtor was negligent in his handling of the Federal Case.

■ Section 523(a)(4) provides that a Chapter 7 debtor is not discharged from any debt resulting from "fraud or defalcation while acting in a fiduciary capacity. . . ." 11 U.S.C. § 523(a)(4). As required by § 523(a)(4), the creditor must show the following: "1) the existence of a fiduciary relationship between the debtor and the objecting party, and 2) a defalcation committed by the debtor in the course of that fiduciary relationship." *Antlers Roof Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 286 (10th Cir. BAP 1997) (citing *Young*, 91 F.3d at 1371–72).

■ The existence of a fiduciary relationship is a threshold issue under § 523(a)(4). *Id.* The Tenth Circuit has narrowly construed the phrase "fiduciary capacity." *Young*, 91 F.3d at 1371–72. In cases where the debtor is an attorney and the creditor is a client, the Tenth Circuit requires more than a general attorney-client relationship to establish a fiduciary relationship under § 523(a)(4). *Id.* at 1372.[14] Such a fiduciary relationship will exist only where there is an express or technical trust. *Id.* at 1371. Although the question of fiduciary status is one of federal law, state law is important when determining whether a trust relationship exists. *Id.* A technical trust is a trust imposed by law that arises by statute. *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir.1976).

Watson bases the argument that her Claim is nondischargeable pursuant to § 523(a)(4) solely on the fact that she and the Debtor had an attorney/client relationship. This directly contradicts the Tenth Circuit's holding that there must be more to establish a fiduciary relationship under § 523(a)(4) than a general attorney/client relationship. To establish the necessary, fiduciary relationship under § 523(a)(4), it was incumbent on Watson to introduce some evidence of an express or technical trust.

The bankruptcy court found that there was no evidence of a fiduciary relationship between the Debtor and Watson so as to support Watson's argument that her Claim was nondischargeable pursuant to § 523(a)(4). This finding was not clearly erroneous.

Watson next argues that the debt was nondischargeable because it meets the provisions of § 523(a)(6), which states that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" will not be discharged. 11 U.S.C. § 523(a)(6). The attorney appears to present this argument strictly to preserve it as he acknowledges that *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), is controlling.

■ In *Geiger* the Supreme Court held that § 523(a)(6) requires that a debtor intend to injure either a creditor or a creditor's property. The Court stated, "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Geiger*, 523 U.S. at 61, 118 S.Ct. 974. This narrow reading of

14. *But see Andy Warhol Found. for Visual Arts, Inc. v. Hayes (In re Hayes)*, 183 F.3d 162, 170 (2d Cir.1999) (holding "that the attorney-client relationship, without more, constitutes a fiduciary relationship within the meaning of Section 523(a)(4).").

"willful" is akin to the standard of deliberate injury necessary for an intentional tort. *Id.* at 61–62, 118 S.Ct. 974.

Here, the bankruptcy court gave Watson ten days after its ruling in which to seek permission to present evidence that the Debtor had the intent to injure Watson or her property. Watson never did so. There is no evidence in the record of this kind of intent.[15]

## V. *Conclusion*

For the reasons set forth above, the bankruptcy court's Order is AFFIRMED.

---

**15.** Watson also claims that the court erred in discharging the claim because there are potential punitive damage claims against the Debtor. The bankruptcy court found that punitive damages will only be assessed when there is an intentional tort. Because Watson never introduced any evidence to the bankruptcy court establishing an intentional tort under § 523(a)(2), (4), or (6), the issue of punitive damages is irrelevant.