(144 P.3d 771)
No. 94,765

IN THE MATTER OF THE CONSERVATORSHIP OF:
ETHAN JOHN CHAPMAN, A Minor.

IN THE MATTER OF THE CONSERVATORSHIP OF:
MATTHEW ALAN CHAPMAN, A Minor.

IN THE MATTER OF THE CONSERVATORSHIP OF:
JARED SCOTT CHAPMAN, A Minor.

Opinion
filed October 20, 2006.

*T. Michael Wilson, Douglas C. Cranmer,* and *Jeffrey N. Lowe,* of Stinson, Lasswell & Wilson, L.C., of Wichita, for appellant.

*Jon S. Womack,* of Wichita, for appellee.

Before JOHNSON, P.J., ELLIOTT and BUSER, JJ.

JOHNSON, J.: This is a consolidated appeal from orders entered in the probate proceedings involving three conservatorships, one for each of the children of Thomas Chapman and Deborah Chapman. The overarching question presented is whether Thomas could withdraw funds from the children's conservatorship estates to pay his child support obligations which were court-ordered in a separate divorce proceeding. Finding that Thomas, as conservator of his children's estates, misused conservatorship funds, we reverse and remand.

Our issues arise because of the interface of two scenarios: Thomas' injury and retirement from the Derby Police Department and the marital discord between Thomas and Deborah. Thomas' injury eventually led to the establishment of conservatorships to receive the children's separate share of Thomas' disability/retirement benefits. Thomas' child support obligations were established in two divorce proceedings.

Deborah and Thomas first married in December 1984; their first child, Ethan, was born in April 1989. Effective July 15, 1989, Thomas retired from his job as a police officer with the City of Derby Police Department after an injury left him disabled. Thomas' retirement due to disability entitled him to receive benefits from the Kansas Police and Firemen's Retirement System (KP&F), which is administered by the Kansas Public Employees Retirement System (KPERS). See K.S.A. 74-4953(1) (creating KP&F as a division of KPERS).

Thomas' benefits as a member of KP&F were computed at 50% of his final average salary. KP&F provided a separate benefit to Ethan initially equal to 10% of Thomas' final average salary. The benefits payable to a member's child or children is in addition to and does not diminish the member's disability/retirement amount. Further, the total benefits paid to a member and his or her children cannot exceed 75% of the predisability salary. See K.S.A. 74-

4960(1)(c). Thus, under the statute where a member has three or more children, each child will receive a pro rata share of 25%, rather than 10% each.

Deborah filed for divorce on August 20, 1991, and the decree was filed February 12, 1992. Thomas was ordered to pay monthly child support of $441.

In 1992, the legislature amended K.S.A. 74-4960 to require that KP&F benefits which are payable to a minor must be made to a conservator. L. 1992, ch. 321, sec. 14. Accordingly, on November 13, 1992, Thomas filed a petition to be appointed as Ethan's conservator, and the petition was heard forthwith. Thomas did not give, and the district court did not require, legal notice to any other person, including Deborah. The court did not appoint a guardian ad litem to represent Ethan's interests. Thomas was appointed as Ethan's conservator but was not required to file a surety bond.

Thereafter, Thomas used Ethan's conservatorship funds to pay his $441 monthly child support obligation. Additionally, Thomas reimbursed himself from the conservatorship estate for the child's medical insurance costs.

Thomas and Deborah subsequently reconciled, and Thomas discontinued paying child support from Ethan's conservatorship. On June 21, 1995, the couple had a second child, Matthew. On September 11, 1995, Thomas filed a petition and obtained an order forthwith appointing himself as conservator for Matthew without bond. Thomas reimbursed himself from Matthew's conservatorship for his one-half of the medical bills associated with Matthew's birth. Thereafter, he took the monthly cost of Matthew's health insurance from the child's conservatorship funds.

On March 3, 1997, Thomas and Deborah remarried. A third child, Jared, was born on May 2, 1997. A second divorce action was filed on August 22, 1997. In October 1997, Thomas began withdrawing $200 per month from each of the existing conservatorship estates to apply toward his child support obligation. Thomas' child support obligation the second time around was ultimately set at $775 per month.

On November 20, 1998, Thomas effected a summary, same-day appointment as Jared's conservator, without bond. Thereafter,

Thomas took $200 per month from Jared's conservatorship also. The $600 withdrawn from the three conservatorship estates was deposited into Thomas' personal checking account, from which he then paid his child support obligation.

During the period of December 1992 through December 2003, Thomas made disbursements from Ethan's conservatorship for child support and health insurance purposes totaling $36,088.42. During the period of January 1995 through December 2003, Thomas made disbursements from Matthew's conservatorship for child support, health insurance, medical bills, and conservatorship charges totaling $19,560.02. During the period of April 1999 through December 2003, Thomas made disbursements from Jared's conservatorship for child support purposes totaling $11,800.

In January 2004, Deborah filed petitions in each of the conservatorship proceedings, seeking to remove Thomas as conservator for failing to fulfill his conservatorship duties, including wrongfully using the conservatees' assets to pay his personal court-ordered child support obligation. Deborah also requested that Thomas be ordered to reimburse any funds found to have been innocently misused or, in the alternative, to charge Thomas double the value of any funds which were found to have been embezzled or converted for Thomas' personal use. The petition included an additional prayer for lost earnings and the costs to recover the funds or assets, including attorney fees.

Deborah also sought relief in the divorce proceeding. In July 2004, Deborah obtained an income withholding order to effect the payment of all of the child support from Thomas' own share of the KP&F benefits. The following month, a hearing officer ruled the money deposited in the children's conservatorships as a result of Thomas' disability should "be credited/paid/authorized for child support." Deborah appealed to the district court, which reversed the hearing officer's decision in a letter ruling dated September 28, 2004. Specifically, the district court found: "Monies from [Thomas'] disability designated for children cannot and shall not be credited towards [Thomas'] child support obligation prospectively."

For simplicity, we will refer to the district court as the divorce court when referring to actions taken in the divorce proceedings and as the probate court when referring to actions taken in the conservatorship proceedings.

On September 27 and November 2, 2004, the probate court conducted a hearing on Deborah's petition, during which the parties proffered the basic underlying facts. Importantly, Thomas testified and conceded that he never sought or obtained the probate court's approval to use money from the children's conservatorships to satisfy his child support obligations.

Although the probate court acknowledged the divorce court's contrary finding, the probate court nonetheless ruled Thomas "can and should receive credit for the payment of his child support obligation in the amount deposited in the Conservatorship from KPERS for the benefit of each of the children." In doing so, the probate court likened the factual scenario to that found in *Andler v. Andler*, 217 Kan. 538, 538 P.2d 649 (1975), and *In re Marriage of Martin*, 32 Kan. App. 2d 1141, 95 P.3d 130 (2004). Apparently equating a right to offset against a child support obligation with the right to withdraw funds from the children's conservatorship estates, the probate court ultimately denied Deborah's requests to remove Thomas as conservator, to appoint a successor conservator, and to order the reimbursement of funds withdrawn by Thomas.

On appeal, Deborah raises four issues, claiming the probate court erred by: (1) finding that the children's KP&F benefits can be used as a credit against Thomas' child support obligation; (2) denying the requested removal of Thomas as conservator and the requested appointment of a successor; (3) refusing to order Thomas to reimburse the conservatorship estates for the monies withdrawn by him to pay his court-ordered obligations; and (4) refusing to order Thomas to pay Deborah's legal fees and expenses. Thomas did not appeal the divorce court's rulings, and he does not cross-appeal any of the probate court's rulings.

## CREDIT AGAINST CHILD SUPPORT OBLIGATION

Deborah begins by challenging the probate court's finding that Thomas was entitled to a credit against his divorce court child

support obligations for the amount of KP&F benefits payable to his children. She essentially attacks the finding on two levels. First, she contends that the probate court was collaterally estopped from relitigating the issue after the divorce court had ruled that no credit was due. Secondly, Deborah argues that the probate court improperly relied upon the *Andler* and *Martin* decisions.

### Collateral estoppel

Whether the doctrine of collateral estoppel applies is a question of law providing this court with unlimited review. *O'Keefe v. Merrill Lynch & Co.*, 32 Kan. App. 2d 474, 479, 84 P.3d 613, *rev. denied* 278 Kan. 846 (2004). However, we need not separately analyze the three elements of collateral estoppel. See *O'Keefe*, 32 Kan. App. 2d at 483 (reciting the requirements to apply collateral estoppel). Deborah did not specifically ask the probate court to apply the doctrine. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003) (issue not raised before district court cannot be raised on appeal); *In re Marriage of Vargas*, 20 Kan. App. 2d 480, 487, 891 P.2d 462 (1994), *rev. denied* 257 Kan. 1092 (1995) (collateral estoppel argument deemed waived where appellant failed to raise issue prior to district court's judgment).

Additionally, the salutary purposes of collateral estoppel are "(1) to avoid the expense and vexation attending multiple lawsuits, (2) to conserve judicial resources, and (3) to foster reliance on judicial action by minimizing the possibility of inconsistent decisions. [Citation omitted.]" *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 635, 669, 941 P.2d 1321 (1997). Here, Deborah initiated both proceedings, thus causing the expense of concurrent multiple lawsuits and opening the door for inconsistent rulings. Applying collateral estoppel in this scenario to protect Deborah against the problems she created or facilitated would not serve the purposes of that doctrine.

### Application of Andler and Martin

The parties agree that the issue of whether Thomas was entitled to a credit against his child support obligation for payments made by KP&F to the children's conservatorships is one of first impres-

sion in Kansas that presents a question of law subject to de novo review. See *Munck v. KPERS*, 35 Kan. App. 2d 311, 315, 130 P.3d 117 (2006) (proper application of statutory provision is question of law providing appellate court with unlimited review). *Cf. Andler*, 217 Kan. at 542 (whether Social Security disability payments made for benefit of children of disabled father constituted satisfaction of father's child support obligation is question of law to be resolved by courts). However, given the *Andler* decision, the issue does not come to us in a vacuum.

In *Andler*, a divorced father was ordered to pay child support. After the divorce became final, the mother, as the children's custodial parent, began receiving monthly Social Security disability benefits for the benefit of the minor children as a result of the father's disability. Subsequently, the father stopped making child support payments, prompting the mother to file a motion for a citation in contempt and for a determination of child support arrearage. The district court declined to find the father in contempt and ordered the child support payments terminated because the mother was receiving Social Security disability payments for the benefit of the children in an amount that exceeded the father's child support obligation.

Ultimately, our Supreme Court likened Social Security to a private insurance contract "wherein a father insures against his possible future disability and loss of gainful employment by providing for the fulfillment of his moral and legal obligations to his children." 217 Kan. at 542. The *Andler* court then held:

"[W]here a father who has been ordered to make child support payments becomes totally and permanently disabled, and unconditional Social Security payments for the benefit of the minor children are paid to the divorced mother, the father is entitled to credit for such payments by the government against his liability for child support under the divorce decree. The father is entitled to credit, however, only up to the extent of his obligation for monthly payments of child support, but not exceeding it." 217 Kan. at 544.

Similarly, at issue in *Martin* was whether a divorced father could receive credit against his child support obligation for Social Security payments received by his children as a result of his retirement, rather than his disability. As in *Andler*, the minor children received

monthly Social Security payments as a result of the father's status, and those payments were sent directly to the mother as the children's custodial parent. The *Martin* court applied *Andler* to allow the father credit against child support, adopting the reasoning set forth in *McClaskey v. McClaskey*, 543 S.W.2d 832, 834 (Mo. App. 1976), which determined that the manner of the child support payment was irrelevant because the nature of the funds was the same. 32 Kan. App. 2d at 1146.

Deborah argues that *Andler* and its progeny are inapplicable here because of factual distinctions. She attempts to explain how the KP&F benefits differ from Social Security benefits. Her arguments are unpersuasive. Deborah also argues that the KP&F requirement that the children's benefits must be paid to a conservatorship distinguishes those payments from Social Security disability or retirement benefits. Although that requirement has implications which will be addressed below, it does not change the character or nature of the KP&F disability/retirement benefits.

Deborah's most persuasive argument involves the practical result of granting Thomas a child support credit. That is, the children had their money taken from them simply because their parents could not live together compatibly, *i.e.*, the children funded the divorce. As Deborah points out, during the period when she and Thomas were reconciled, the children received and kept all of their benefits. Presumably, during the period of cohabitation, a portion of Thomas' own share of the disability benefits was utilized to comply with his legal duty to support the children in his household. After the parents separated, the children's individual benefits were used to satisfy Thomas' legal support obligation, while Thomas got to keep nearly all of his own KP&F benefits.

In that context, the *Andler* holding is logical only if the disabled parent's child support obligation is based on his or her predisability income, *i.e.*, the disability occurred after the amount of child support was set. To illustrate, suppose that a parent was making $2,000 per month when the child support was computed, but subsequently had his or her income reduced to $1,000 per month post-injury disability income, with the children collectively receiving $250 per month separate disability benefits. The children's sepa-

rate $250 in disability benefits could reasonably be viewed as an insurance payment designed to replace their portion of the $1,000 of monthly income which the parent lost due to disability. In that scenario, it makes sense to subtract the children's disability benefits from the child support obligation which was based in part on the lost income. In contrast, when the child support calculation is based on the post-injury income of $1,000 per month and the children's $250 is used to fund that reduced child support, the children have not only been deprived of their share of the "lost" income, but also lose at least a portion of their rightful share of the remaining income.

The child support guidelines utilize the parent's income to arrive at an amount of support which that parent is legally obligated to pay. If an injured parent makes one-half of what he or she formerly made, the child support calculation based upon the post-disability income will reflect that change. Further, if the disability creates an unusual financial hardship for the parent, the guidelines provide for adjustments for special circumstances. It should make no difference whether the current income is derived from KP&F benefits or from working at a relatively low-paying job. It makes scant sense to require a laborer to pay all of the calculated child support on a certain amount of income, while allowing a disability recipient making the same income to avoid paying most, if not all, of his or her calculated legal support obligation. As suggested, the children are receiving additional benefits designed to replace the income lost because of their parent's injury. Crediting the children's share of their parent's former salary against the parent's post-injury child support obligation is unfair to the children and an improper windfall to the parent.

Nevertheless, Deborah appears to overlook the most distinguishing aspect of this case. *Andler* and *Martin* were appeals in divorce proceedings involving the question of whether a parent could reduce or discontinue making the court-ordered child support payments. Here, the child support that was paid to Deborah, as the custodial parent, was not reduced or eliminated. Presumably, the Chapmans' divorce proceeding records would reflect that Thomas is paid in full. Thomas did not ask the divorce court to reduce his

support obligation, and he did not attempt to take any self-help credit by paying a reduced amount. Rather, Thomas fully paid his child support each month by taking money from his children's conservatorships.

The distinction is significant, both practically and legally. If Thomas had taken a credit against child support, Deborah would have contemporaneously received significantly less money through the divorce proceedings. She would not have had access to the children's KP&F benefits, because those monies were going into conservatorships over which Deborah had no control. Thus, as a practical matter, a child support credit would have squarely placed the issues on the table in the beginning, over a decade before Deborah instituted this action.

Legally, the difference is significant for the children. Notwithstanding that a credit against child support would have left their mother with less money, the children would still have all of their accumulated share of KP&F benefits, plus whatever income the funds would have earned over the years. If extreme hardship would have necessitated using some of the children's money for their support, disbursements from the conservatorships would have been subject to court approval and oversight. As it is, we have no way of knowing whether the money taken from the children and given to Deborah was actually used for the children's benefit.

As noted, the divorce court's ruling that Thomas was not due any credit for the children's benefits has not been appealed. The probate court's ruling on that issue was not germane to the issues presented in the conservatorship proceedings. Any right Thomas may have acquired to reduce his court-ordered child support payments in the divorce proceeding because of his children's separate KP&F benefits did not automatically translate into a right to take the children's conservatorship money to pay the full amount of court-ordered child support notwithstanding that the KP&F benefits were paid into the conservatorships. Therefore, we will proceed to consider the questions which were properly before the probate court.

## WITHDRAWALS OF CONSERVATORSHIP FUNDS

Deborah argues that the probate court erred in refusing to remove Thomas as conservator. She claims that Thomas failed to faithfully and diligently carry out his fiduciary duties and responsibilities as conservator. Principally, she complains that Thomas wrongfully withdrew funds from the conservatorship estates to pay his personal child support obligation without obtaining the requisite court approval. In a separate issue, Deborah contends the probate court should have ordered Thomas to reimburse the conservatorships for the wrongfully withdrawn funds. Both issues hinge upon a determination of whether Thomas violated his conservatorship duties by misusing or converting funds from the conservatorship estates. Neither removal nor reimbursement was required if Thomas' actions were authorized.

Shortly before oral arguments on appeal, the probate court accepted Thomas' resignation as conservator of each child's estate and appointed a successor conservator. The order specifically provided that Thomas was not released from any liability for his acts as conservator. Thus, although the removal question is now moot, much of the discussion on that point is still germane to the liability question.

The parties do not agree on the applicable standard of review. We can perceive of no dispute as to the material facts, but rather view the case as turning upon the resolution of legal questions requiring statutory interpretation. Accordingly, our review is unlimited. See *Munck*, 35 Kan. App. 2d at 315; *In re Estate of Briley*, 16 Kan. App. 2d 546, 547, 825 P.2d 1181 (1992).

Our obvious starting point is to review a conservator's statutory duties, responsibilities, and powers, which are set forth in K.S.A. 59-3078. A conservator is required to carry out his or her duties and responsibilities "diligently and in good faith" and is at all times subject to a court's control and direction. K.S.A. 59-3078(a)(1). "A conservator shall at all times act in the best interests of the conservatee and shall exercise reasonable care, diligence and prudence." K.S.A. 59-3078(a)(2). Specific provisions applicable here are:

"(b) A conservator shall have the following general duties, responsibilities, powers and authorities:

(1) To pay the reasonable charges for the support, maintenance, care, treatment, habilitation and education of the conservatee in a manner suitable to the conservatee's station in life and the value of the conservatee's estate; but *nothing herein shall be construed to release a natural guardian from the ordinary obligations imposed by law for the support, maintenance, care, treatment, habilitation and education of the natural guardian's minor children*;

. . . .

"(f) A conservator shall *not* have the power:

(1) *To use the assets of a minor's estate to pay any obligation imposed by law upon the minor's natural guardian or natural guardians, including the support, maintenance, care, treatment, habilitation or education of the minor, except with the specific approval of the court granted upon a showing of extreme hardship.*" (Emphasis added.) K.S.A. 59-3078.

Thomas, as a parent of Ethan, Matthew, and Jared, is a "natural guardian" of those conservatees. See K.S.A. 59-3051(l) (defining "natural guardian"). As a parent, Thomas has a duty to support his minor children. See *Keller v. Guernsey*, 227 Kan. 480, 486, 608 P.2d 896 (1980). Likewise, the divorce court child support orders were obligations imposed by law upon Thomas to provide for his children's support, maintenance, care, treatment, habilitation, and education.

K.S.A. 59-3078(b)(1) clearly provides that Thomas' legal duty to support Ethan, Matthew, and Jared was unaffected by the establishment of their conservatorships. See also K.S.A. 59-3053(b) ("Nothing in this [conservatorship] act shall be construed to relieve a natural guardian of any obligation imposed by law for the support, maintenance, care, treatment, habilitation or education of that natural guardian's minor child."). Emphasizing and clarifying that point, K.S.A. 59-3078(f)(1) specifically denied Thomas the power to use any of the conservatorship funds to pay for his children's support without the probate court's specific approval.

Thomas admitted that he used conservatorship funds to pay court-ordered child support, *i.e.*, he proceeded "[t]o use the assets of a minor's estate to pay [a support] obligation imposed by law upon [him as] the minor's natural guardian." Thomas admitted that he did not attempt to make a showing of extreme hardship in order to obtain the specific approval of the probate court, and he admits

that he did not have specific court approval to use conservatorship funds to pay for the children's support. Those admissions place Thomas squarely in violation of the statutory prohibitions on the use of conservatorship funds. In other words, Thomas has admitted to misusing the assets of the conservatorship estates.

Thomas contends that his entitlement to a credit against the court-ordered child-support invested him, as conservator, with the authority to use the conservatorship funds for child support, notwithstanding that such authority is clearly and specifically withheld in K.S.A. 59-3078(f)(1). To the contrary, the conservatorship provisions are unaffected by the *amount* of the support obligation imposed by law upon a natural guardian. Accordingly, the probate court had no reason to question the efficacy or propriety of the amount of child support imposed by law upon Thomas. Rather, the probate court's job was to protect the conservatees' estates and assure that *no* amount of conservatorship funds was used to pay Thomas' child support. Thus, the district court erred in finding that a parent's right to reduce his or her child support payment by the amount of separate KP&F disability/retirement benefits paid to his or her children provided an independent authorization to use the assets of the minor's conservatorship estate to pay the parent's legal support obligation.

Thomas suggests that he had court approval for the withdrawals, pointing to the probate court findings that the conservatorship files contained journal entries of periodic review in which the court found that the conservator was serving the needs of the conservatee. Apparently, the periodic reviews were undertaken by the court, *sua sponte*, without notice to any of the interested parties. The procedure followed is distinguishable from that in which a conservator petitions for court approval of his or her accountings after proper notice and a hearing. Therefore, we find that the journal entries did not provide Thomas with specific approval to pay his child support with conservatorship funds.

Likewise, we are unpersuaded by Thomas' argument that "[a]ll of the money received through the disability payments from KPERS was used for the children in some way." The 1992 legislative requirement that a minor's KP&F benefits must be paid to

a conservatorship was in response to a request from KPERS because of its concern that such benefits might not be actually used for the child's benefit. That rationale is effected if the supervising court requires proof that expenditures are made to vendors or service providers for items that directly benefit the child. However, permitting the money to be paid to the custodial parent circumvents the initial purpose of requiring a conservatorship and resurrects the concerns which prompted the 1992 amendment. We have no proof that Deborah actually used the child support money for the direct benefit of her children, any more than KPERS knew whether KP&F children's benefits paid directly to custodial parents were being used for the children's benefit.

## CONSERVATOR'S LIABILITY

Having determined that Thomas misused conservatorship funds, we turn to the appropriate remedy or sanction to be imposed. Again, the legislature has given the district court explicit directions. K.S.A. 59-3088 addresses the procedure for the resignation or removal of a conservator and provides, in relevant part:

"(e) At the conclusion of the hearing, if the court finds, by a preponderance of the evidence, that the guardian or conservator, or both, should be permitted to resign, or should be removed for failure to fulfill the duties or responsibilities of being a guardian or conservator, or for the manner in which the guardian or conservator has exercised the powers or authorities granted to the guardian or conservator, the court may so order and in such case shall revoke the letters of guardianship or conservatorship, or both, previously issued pursuant to K.S.A. 59-3069, and amendments thereto. The court may appoint a successor guardian or conservator, or both. In making any such appointments, the court shall act in accordance with K.S.A. 59-3068 and 59-3069, and amendments thereto.

"(f) If the court finds that the conservator has innocently misused any funds or assets of the conservatee's estate, the court *shall* order the conservator to repay such funds or return such assets to the conservatee's estate. If the court finds that the conservator has embezzled or converted for the conservator's personal use any funds or assets of the conservatee's estate, the court *shall* find the conservator liable for double the value of those funds or assets, as provided for in K.S.A. 59-1704, and amendments thereto. In either case, the court may order the forfeiture of the conservator's bond, or such portion thereof as equals the value of such funds or assets, including any lost earnings and the costs of recovering those funds or assets, including reasonable attorney fees, as the court *may* allow, and may require of the surety satisfaction thereof. Neither the conservator, nor the con-

servator's estate or surety, shall be finally released from such bond until the satisfaction thereof." (Emphasis added.)

The legislative directive does not grant the district court any discretion with respect to the conservator's repayment; it *shall* order repayment of innocently misused funds, and it *shall* find the conservator liable for double the value of converted or embezzled funds. Thus, the only question here is whether Thomas innocently misused conservatorship funds or wrongfully converted conservatorship funds for his personal use.

The district court found that Thomas had not converted the conservatorship funds for his personal use. However, that finding was based upon the erroneous belief that Thomas was authorized to use the children's disability benefits to pay court-ordered child support. We perceive that we need not remand for the district court to reevaluate under the proper legal parameters. The controlling facts are not in dispute, especially Thomas' admission that he withdrew money from the conservatorships to pay child support without court approval. See *Briley*, 16 Kan. App. 2d at 547 (where controlling facts are based on stipulations and documentary evidence, an appellate court may determine de novo what the facts establish).

On the one hand, Thomas acknowledges that he received a letter from the probate court upon the establishment of each conservatorship, which specifically instructed that

"a parent-conservator of a minor conservatee cannot use the minor's property for support of such minor unless the court has previously signed an order authorizing such expenditures. In which event, you must first cause a Petition to be filed together with an order for hearing and give notice as directed by the Court. Ordinarily, the Court will not authorize the expenditure of funds for the purchase of an automobile for a minor."

Thomas concedes that he did not follow the foregoing instructions and did not have a court order authorizing the expenditure of conservatorship property for the conservatees' support.

On the other hand, the record contains a letter from Thomas' counsel which states:

"I discussed your situation with the Court and the fact that your child support payment exceeds the KPERS retirement benefit, and the Court advised that in-

itially a separate bank account would not have to be opened in this matter. The KPERS check for your son should be made payable to you as Conservator and the simplest way to proceed would be to endorse the check as Conservator, write your child support check and then deposit the KPERS check in the account from which the support payment is paid. Technically you are not suppose[d] to co-mingle conservatorship funds and your funds, but I feel that if you make your child support payment first and then deposit the KPERS check in the same account, you in effect will be reimbursing yourself as you are allowed to do."

Further, the current supervising court believed that Thomas was authorized to use the conservatorship funds to pay child support. Accordingly, it is difficult to characterize Thomas' actions, as a lay person, as rising to the level of culpable wrongdoing which one would contemplate to be necessary to invoke double liability.

Deborah contends the funds were converted for Thomas' personal use because they were used to satisfy his personal debt. Thomas derived the benefit of having his legal child support obligation paid in full. While that is true, Thomas intended for the children to be the ultimate beneficiaries of the withdrawn funds when he paid the money as child support. Indeed, Deborah willingly accepted the child support payments for years without complaining about the source of the payments. If those funds were not expended for the benefit of the children, Deborah would be to blame.

Therefore, we find that the facts established that Thomas innocently misused the funds of the conservatorships when he paid the court-ordered child support and medical obligations with conservatorship funds. Pursuant to K.S.A. 59-3088(f), Thomas must be ordered to repay the conservatorships for the improperly used funds.

*ATTORNEY FEES*

Finally, Deborah makes a short, conclusory argument that she is entitled to the attorney fees and expenses she incurred in seeking Thomas' removal as conservator. She relies on K.S.A. 59-3088(f), set forth above, and K.S.A. 59-3089(d), which utilizes identical language with respect to the costs of recovering funds or assets.

However, the precise language of those statutes permits a district court the discretion to "order the forfeiture of the conservator's

bond, or such portion thereof as equals the value of such [misused or converted] funds or assets." The statute does not address the situation where the court initially failed to order the filing of a bond. See K.S.A. 59-3069(b) (the court shall require the individual appointed as conservator to file a bond with the court, conditioned upon the faithful discharge of all of the duties of the conservator's trust according to law). Nevertheless, the statute is clearly designed to provide for reimbursement of recovery costs to the conservatorship estates and not individually to Deborah.

One would contemplate that Deborah's remedy would be to file a petition for allowance of demand against the conservatorships for her expenditures that brought money into those estates. We do not read the statutes as allowing an order directing Thomas to directly pay Deborah for the attorney fees and expenses she personally expended. Therefore, upon present showing, the district court's denial of Deborah's attorney fee request is affirmed. We also note that the issue of any earnings that the conservatorship estates may have lost because of the conservator's misuse of funds has not been raised in this appeal.

Affirmed in part and reversed in part.