In re Troy Lee TATRO, Lori Ann Tatro, Debtors.

Ashlee Mohr, Plaintiff,

v.

Troy Lee Tatro, Defendant.

Bankruptcy No. 06–12273.
Adversary No. 07–5087.

United States Bankruptcy Court, D. Kansas.

May 22, 2008.

836

Steven L. Speth, Wichita, KS, for Debtors/Defendant.

Carl B. Davis, Wichita, KS, for Plaintiff.

Timothy J. King, Wichita, KS, for Defendant.

## MEMORANDUM OPINION

ROBERT E. NUGENT, Bankruptcy Judge.

In this adversary proceeding, plaintiff Ashlee Mohr, daughter of defendant and debtor Troy Lee Tatro, claims that Tatro breached his fiduciary duty as her natural guardian under Kansas law by spending personal injury settlement funds he received on her behalf while she was a minor. She asserts that his debt for these funds should be excepted from Tatro's discharge under 11 U.S.C. § 523(a)(4). Tatro defends the complaint on three grounds: first, that he was not in the requisite fiduciary relationship for application of § 523(a)(4); second, that he expended the money for Mohr's needs and wants during her minority; and third, that her claims are barred by the applicable statutes of limitation.

The Court has jurisdiction of this core proceeding.[1] In addition to evidence adduced at trial, the Court received the stipulations of the parties embodied in the pretrial order.[2] Plaintiff Mohr appeared in person and by her attorney F.C. "Rick" Davis, II. Defendant Tatro appeared in person and by his attorney Timothy J. King. After careful review of the evidence and the governing law, the Court is ready to rule.

*Facts*

Plaintiff Ashlee Tatro Mohr was born on August 10, 1986 and reached the age of majority on August 10, 2004. Her father Troy was her natural guardian.[3] Apparently, Mohr's biological mother was not involved in her life and Tatro (and his current wife and joint debtor) raised Mohr.[4] Mohr moved out of Tatro's home after she graduated high school and turned seventeen in August, 2003.

On October 18, 1997, Mohr was injured in an auto accident. As a result, she received an insurance settlement on or about September 28, 1998 in the amount of $4,146 ("the 1998 settlement"). Acting as her guardian, Tatro took possession of the funds. The parties stipulate that Tatro spent the money "for the use and benefit of Ashlee Mohr's day-to-day needs as well as her desires for items of a non-necessary nature ... from September 28, 1998 through June 11, 2003."[5]

On June 11, 2003, Tatro received settlement funds in the amount of $8,000 on account of a second injury suffered by Mohr at a Wal–Mart store on June 2, 2002 ("the 2003 settlement"). In addition, Wal–

1. 28 U.S.C. §§ 157(b)(2)(I) and 1334.

2. Dkt. 25.

3. KAN. STAT. ANN. § 59–3051(*l*) (2005).

4. Trial Ex. 3.

5. Dkt. 25, Pretrial Order, p. 3, ¶ 6.

Mart agreed to pay Mohr's medical expenses directly to her health care providers. Tatro utilized the $8,000 much as he had done with the earlier settlement money.[6]

Among other things purchased with the 2003 settlement funds was a car Mohr bought from Tatro at age sixteen. Mohr testified that she paid part of the consideration for the car with babysitting money and Tatro paid himself the rest from the 2003 settlement.[7] Tatro's affidavit, filed in a related state court action, avers that Tatro provided Mohr with a car having a value of $6,000.[8] Having heard Mohr testify at trial, the Court credits her testimony. According to Ms. Mohr's testimony, Tatro told her that the settlement was for only $5,000 and he intended to put that money back for her education. When Mohr moved out of the family home, Tatro stopped paying her cell phone bill. Terminating the cell phone service contract resulted in a penalty charge that Tatro supposedly paid from the 2003 settlement money.

There was no evidence concerning how much of the 1998 settlement funds remained by the time Tatro received the 2003 settlement. But the stipulations suggest that the 1998 settlement had been spent by the time Tatro took possession of the 2003 settlement proceeds on June 11.[9]

Because of that, the Court cannot find that Tatro ever had in excess of $10,000 of Mohr's money at any given time between June 2, 2003, the date the $8,000 settlement check was issued, and June 11, 2003, the date the check was cashed and Tatro received the funds.[10]

Mohr testified that until some time in 2005, she was unaware of the existence of the 1998 settlement. After she graduated from high school and moved out of the family home in 2003, Mohr received no money from Tatro. According to her, Tatro had paid for her senior high school pictures, class ring and a prom dress with some of the money. Tatro or his wife, Lori (Mohr's stepmother), used some of the settlement money to pay for a trip Lori and Mohr took to Dallas. After Mohr turned nineteen in 2005, she asked Tatro for money to pay for car transmission repairs and he refused her request. Mohr testified that during this conversation with her father, he did not tell her he had spent the money, only that it had been "put aside" for her education and that she could not have it, ostensibly because she was not in school. When the conversation turned ugly, she discontinued it.[11]

Mohr only learned of the 1998 settlement money after inquiring of relatives after Tatro refused to give her the 2003

---

**6.** The parties stipulated that Tatro spent these funds "for the benefit of Ashlee Mohr to help provide for her needs ... from June 11, 2003 through April 1, 2004." Dkt. 25, p. 4, ¶ 8.

**7.** The sequence of events relating to the purchase of the car is confusing. The stipulations state that the car was provided to Mohr on April 1, 2004, which would have been just shy of her eighteenth birthday. *See* Dkt. 25, p. 4, ¶ 9. Mohr turned 16 on August 10, 2002. She was injured at Wal–Mart on June 2, 2002. According to her testimony on cross-examination, she and her father discussed her buying his car after the accident, but before her birthday and well before he received the Wal–Mart settlement. Apparently Tatro anticipat-

ed that there would be a substantial settlement and he indicated to her in 2002 that some of those funds could be used to pay for her car. According to the parties' stipulation, that is what occurred.

**8.** Trial Ex. 1.

**9.** Dkt. 25, p. 3, ¶ 6.

**10.** Trial Ex. 6.

**11.** Tatro did not testify at trial, but the Court observed the demeanor and appearance of both Mohr and Tatro and concludes that there is animosity between the two.

settlement funds in 2005. She learned that the Wal–Mart settlement was $8,000 instead of $5,000 around this time as well. The Court heard no testimony about whether any of the 1998 or 2003 settlement money remained, but it gathers from the stipulations that Tatro had spent all of it on Mohr's support as well as her non-necessary expenses by this time.[12] The Court notes that no documentary evidence, such as bank records, was presented that might itemize when and how the settlement funds were spent. Nor is it apparent from the record that Tatro ever segregated the settlement funds from his own funds or separately accounted for them in any fashion.

When Mohr could not persuade Tatro to give her the settlement funds, she sought legal counsel and, after investigation, filed an action in the District Court of Sedgwick County, Kansas, alleging that Tatro had converted these funds "to his own use and benefit" in violation of his duties as "natural conservator" and K.S.A. § 59–1704.[13]

That action was filed on April 25, 2006.[14] Before the state court case could reach trial, Tatro filed his bankruptcy petition on November 21, 2006 and the state court action was stayed. This adversary proceeding, pled as a cause of action under 11 U.S.C. § 523(a)(4), followed.[15] In the final pretrial order, Mohr described her theory of recovery as "[c]onversion and defalcation while acting in a fiduciary capacity."[16]

*Analysis*

■■■ This deceptively simple case presents a variety of legal questions, the ultimate one being whether Tatro's expenditure of his daughter's settlement funds violated his duties as a natural guardian in a manner amounting to fiduciary defalcation under 11 U.S.C. § 523(a)(4).[17] Under that statute, debts incurred by the debtor by fraud or defalcation in a fiduciary capacity, or for embezzlement or larceny, are excepted from discharge. Section 523(a)(4) provides:

> A discharge under section 727 ... of this title does not discharge an individu-

12. The stipulations indicate the 2003 settlement was spent between June 11, 2003 and April 1, 2004 and the 1998 settlement was spent between September 28, 1998 and June 11, 2003. *See* Dkt. 25, ¶¶ 6, 8.

13. *See* Dkt. 1, Exhibit A.

14. *Ashlee Mohr v. Troy Tatro*, Case No. 06 CV 1741.

15. Dkt. 1. Mohr alleged that Tatro "failed to account for or deliver to [her] the funds received by [Tatro] while acting in his fiduciary capacity." She also alleged that Tatro "converted the funds to his own use in violation of K.S.A. 59–3053(b); 59–3078(b)(1); and 59–1704."

16. Dkt. 25, p. 5.

17. Mohr presented no evidence that Tatro took or used the settlement funds for his own use and benefit, an essential element of a conversion claim under Kansas law. *See Carmichael v. Halstead Nursing Center, Ltd.*, 237 Kan. 495, 701 P.2d 934 (1985) (defining conversion as the unauthorized exercise of the right of ownership over goods or personal chattels belonging to another to the exclusion of the other's rights); *See also*, *In re Conservatorship of Chapman*, 36 Kan.App.2d 730, 144 P.3d 771 (2006) (father-conservator of his children who used conservatorship funds to pay court-ordered child support in divorce proceeding was not subject to conversion penalty under K.S.A. 59–1704; court concluded that conservator did not convert funds for his personal use and that children were ultimate beneficiaries of the withdrawn funds, but that his "innocent misuse" subjected him to repay the funds under K.S.A. 59–3088(f)); *In re Conservatorship of Marcotte*, 243 Kan. 190, 756 P.2d 1091 (1988) (conversion penalty of K.S.A. 59–1704 applies only to funds converted to one's own use). Indeed, the stipulations indicate that Tatro expended the money on Mohr's needs and wants. Accordingly, the Court cannot conclude that these facts amount to a conversion and thus limits its analysis to the fiduciary defalcation claim under § 523(a)(4).

al debtor from any debt ... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

The party seeking to except such a debt from discharge has the burden of proving that the debtor was a fiduciary, that funds or property were entrusted to him, and that debtor committed a defalcation in the course of the fiduciary relationship.[18] Once that proof is made, the burden shifts to the debtor-fiduciary to account for the entrusted funds.[19] Determining whether this debt should be excepted from Tatro's discharge requires the Court to (1) examine federal law to determine whether his natural guardianship gives rise to a fiduciary relationship; (2) determine what his rights and duties were in respect of that relationship; (3) determine whether an action for breach of those duties is barred by a statute of limitation; (4) determine whether such a breach occurred; and (5)

ascertain to what extent, if any, the breach harmed Mohr.

*Natural Guardians are Fiduciaries within the Meaning of Section 523(a)(4)*

■ The existence of a fiduciary duty under § 523(a)(4) is a legal determination, not a factual one.[20] Tenth Circuit authority is clear that a creditor must demonstrate the existence of an express or technical trust to establish a fiduciary relationship between the debtor and creditor to prevail under § 523(a)(4).[21] This determination is made under federal law although state law is relevant to the inquiry.[22] Under federal bankruptcy case law, the existence of a fiduciary relationship requires that "money or property on which the debt at issue was based was entrusted to the debtor."[23]

■ Here, plaintiff alleges that by operation of state law, Tatro's status as "natural conservator"[24] placed him in a fiducia-

18. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1371–73 (10th Cir.1996) (Creditor has the burden to prove the fiduciary relationship; existence of fiduciary relationship is a legal issue); *Watson v. Parker (In re Parker)*, 264 B.R. 685, 700 (10th Cir. BAP 2001).

19. *Otto v. Niles (In re Niles)*, 106 F.3d 1456 (9th Cir.1997). *See Antlers Roof–Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288 and n. 3 (10th Cir. BAP 1997) (burden shifts to the debtor-fiduciary to render an accounting to show that it complied with its fiduciary duties, citing *Niles* with approval and further noting that the Tenth Circuit never reached whether a defalcation had occurred in *In re Young* and therefore did not reach the appropriate burden of proof for proving a defalcation).

20. *In re Young, supra* at 1372; *Holaday v. Seay (In re Seay)*, 215 B.R. 780, 785 (10th Cir. BAP 1997).

21. *In re Young, supra* at 1371. *See also, Ford Motor Credit Company v. Talcott (In re Talcott)*, 29 B.R. 874, 878 (Bankr.D.Kan.1983) ("Courts will find the requisite express or technical trust when a state statute defines the relationship as a trust, when the relationship has the typical attributes of a trust, or when

the contract expressly creates a trust."); *In re Parker, supra* at 700 (A technical trust is a trust imposed by law that arises by statute.).

22. *In re Young, supra* at 1371; *In re Seay, supra* at 786.

23. *In re Young, supra* at 1371; *In re Seay, supra* at 786 (an identifiable trust *res* must be established in order for an express trust to be created); *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th Cir.1976) (case decided under former Bankruptcy Act § 17(a)(4), the predecessor to § 523(a)(4); contractor who received advances from building owner to pay subcontractors and materialmen stood in fiduciary relationship with owner). *See also In re Woods*, 284 B.R. 282 (D.Colo.2001).

24. The use of the term "natural conservator" is somewhat of a misnomer where Tatro is actually the "natural guardian" of Mohr, as that term is defined in Kan. Stat. Ann. § 59–3051(*l*). While "conservator," "guardian," and "natural guardian" are all defined terms in § 59–3051, the term "natural conservator" does not appear. The parties have tended to use the terms "conservator" and "guardian" interchangeably in these proceedings. The Court in this opinion, shall refer to Tatro as

ry relationship with Mohr and conferred upon him the corresponding duties. For a fiduciary capacity to arise under a statute, the state statute must: (1) define the res; (2) spell out the fiduciary duty; and (3) impose a trust on funds prior to the act creating the debt.[25]

■ In Kansas, a biological parent is the "natural guardian" of a minor child.[26] Under KAN. STAT. ANN. § 59–3053(a) (2005), a natural guardian has a number of rights and duties that are enumerated as follows:

A natural guardian shall have the right to the custody of the natural guardian's minor child and the right to exercise control over the person of the natural guardian's minor child as provided by law, unless a guardian has been appointed for the minor. The natural guardian of such minor has the right and *responsibility to hold in trust and manage such person's estate for such person's benefit all of the personal and real property vested in such minor when the total of such property does not exceed $10,000 in value,* unless a guardian or conservator has been appointed for the minor.[27]

Not only does the natural guardian have the right to custody and control of the minor child, but he also has the duty to hold the child's estate in trust for the child's benefit when the total value of that estate does not exceed $10,000. Here, Tatro is undisputedly Mohr's natural guardian and is subject to § 59–3053(a).[28]

■ The Court concludes that § 59–3053(a) defines the *res* of a natural guardian's trust; spells out his fiduciary duties; and imposes a trust on such funds of the child as come into the natural guardian's possession and control. The 1998 settlement and 2003 settlement funds are precisely the type of property that Tatro held in trust as Mohr's natural guardian. In short, the natural guardian statute, § 59–3053(a), creates a technical or express trust, as required for a fiduciary relationship to exist under § 523(a)(4).

The Court next determines whether Tatro's expenditure of the settlement funds for Mohr's necessaries and non-necessary expenses breached that duty. This question also involves both federal and state law.

*Tatro's Expenditure of Estate Funds for Support*

■ Although the Tenth Circuit Court of Appeals has not opined on the meaning of "defalcation" in a § 523(a)(4) context,[29]

the natural guardian of Mohr, as the Court concludes that this is technically the correct characterization of Tatro's relationship to Mohr under Kansas law and Tatro was not appointed by a court as a conservator or guardian over Mohr.

25. *See Medved v. Novak (In re Novak),* 97 B.R. 47, 59 (Bankr.D.Kan.1987) (citing *In re Lipke,* 54 B.R. 704, 706 (Bankr.W.D.Wis.1985)); *Merrill v. Merill (In re Merrill),* 252 B.R. 497, 505 (10th Cir. BAP 2000) ("When a state law has created a fiduciary relationship, it must have imposed a trust on property and delineated the fiduciary duties.").

26. KAN. STAT. ANN. § 59–3051(*l*). A "minor child" is one who has not reached the age of 18 or one who has not been married while 16 or older. KAN. STAT. ANN. § 59–3051(j) and § 38–101.

27. KAN. STAT. ANN. § 59–3053(a) (Emphasis added).

28. As noted previously, there is no evidence to establish that Tatro held in excess of $10,000 at any point in time. The stipulations suggest that the 1998 settlement funds were exhausted by the time Tatro received the 2003 settlement on behalf of Mohr. This fact is pertinent because if Tatro had held in excess of $10,000, he would have been required to establish a guardianship or conservatorship and to be appointed a guardian or conservator by the court and would have been subjected to court supervision. *See* KAN. STAT ANN. § 59–3053(a).

29. The Court's research disclosed no published decisions by the Tenth Circuit Court of Appeals defining a defalcation. The Court is, however, aware of the Tenth Circuit's unpub-

the Tenth Circuit Bankruptcy Appellate Panel (BAP) has. In *In re Storie*,[30] the BAP stated that defalcation is a fiduciary's failure to account for entrusted funds that is due to a breach of fiduciary duty, whether intentional, wilful, reckless, or negligent.[31] Under this definition, it is clear that Tatro's actions potentially fall within the defalcation exception. The natural guardian statute required him to account for Mohr's funds that came into his possession. The parties have stipulated that he spent all the funds on Mohr's support and non-necessary items for her.

Plaintiff argues that when Tatro spent Mohr's funds on her support, he violated the duties of a natural guardian. This argument is not without appeal. KAN. STAT. ANN. § 59–3053(b) makes clear that simply being a natural guardian in no way relieves a parent of his legal support obligation toward his minor child.[32] While there are no cases interpreting this subsection, one common-sense reading would suggest that a parent is required to support his children from his own property without invading their separate estate over which he has full control. This is consistent with this Court's general understanding of a fiduciary's duty to place his principal's interests above his own.[33]

But the language of KAN. STAT. ANN. § 59–3053(b) cannot be read in isolation. This subsection does not expressly prohibit

---

lished opinion in *Oklahoma Grocers Assoc., Inc. v. Millikan (In re Millikan)*, 2006 WL 1755960, 188 Fed.Appx. 699 (10th Cir.2006) (despite acknowledging that the Tenth Circuit had not yet defined a defalcation under § 523(a)(4), it declined to address varying definitions and degrees of debtor culpability for a "defalcation," concluding that "some portion of misconduct" was required and satisfied under the facts of that case).

30. *Antlers Roof–Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283 (10th Cir. BAP 1997).

31. *Id.* at 288–89 (requiring no mental culpability on the part of the debtor-fiduciary). *See also Merrill v. Merrill (In re Merrill)*, 252 B.R. 497, 506 (10th Cir. BAP 2000) (Debtor, a trustee of trust established under the Uniform Transfers to Minor Act for his minor daughter, who improperly withdrew funds from trust and invested them in an oil and gas investment, committed a fiduciary defalcation, without regard to intent). But *see Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17–19 (1st Cir.2002) (court declines to follow *Storie*, holding instead that defalcation requires a degree of fault closer to fraud, but without a strictly specific intent on the part of the fiduciary; also stating that inherent in defalcation is the requirement that there be a breach of fiduciary duty).

32. A parent's obligation of support for a minor children is well-recognized under Kansas common law. *See State v. Krumroy*, 22 Kan. App.2d 794, 796, 923 P.2d 1044, *rev denied* 260 Kan. 999 (1996) (The obligation of a parent to support his children does not arise on contract; it arises because of a duty imposed by the common law and by society upon all parents.). That common law obligation to support a child continues after the parent's divorce and notwithstanding any child support orders issued in the divorce. *Id.* at 798. Moreover, a parent may be criminally prosecuted for nonsupport of a child under Kansas law. *See* KAN. STAT. ANN. § 21–3605(a)(1) (2007) and *State v. Filor*, 28 Kan. App.2d 208, 209–10, 13 P.3d 926 (2000) (discussing elements of crime of nonsupport and noting necessities of life cover, among other things, food, clothing, shelter, and medical care.).

33. *See Brown v. Foulks*, 232 Kan. 424, 657 P.2d 501, 506–07, (1983) (The law does not permit the fiduciary to make use of a fiduciary relationship to benefit his own personal interests at the expense of the other party; fiduciary must refrain from situations where his own interests are brought into conflict with those of his trust.); *Stevens v. Jayhawk Realty Co., Inc.*, 9 Kan.App.2d 338, 342, 677 P.2d 1019 (1984) (It is the duty of fiduciary to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal.).

a natural guardian from paying his child's support obligations from the child's estate. It simply makes clear that a natural guardian is not relieved of his own legal obligation to support his child. No evidence was presented at trial that Tatro was not providing additional support for Mohr with his own property and funds during her minority. When this language is compared to the provisions that govern a conservator's conduct with respect to his child's estate, it becomes clearer that a natural guardian may invade the child's estate for support. KAN. STAT. ANN. § 59–3053(a) provides that when a child's estate exceeds $10,000, the natural guardian loses his right to possess and control the child's estate unless a conservator (not necessarily himself) is appointed.[34] Unlike a natural guardian, a conservator *at all times* is subject to the control and direction of the court.[35]

KAN. STAT. ANN. § 59–3078(b)(1) allows a conservator to pay reasonable expenses for the support, maintenance, care, and education of a conservatee, "but nothing herein shall be construed to release a natural guardian from the ordinary obligations imposed by law for the support, maintenance, care, ... and education of the natural guardian's minor children."[36] This language is virtually identical to that contained in KAN. STAT. ANN. § 59–3053(b). However, KAN. STAT. ANN. § 59–3078(f)(1) specifically denies a conservator the power to "use the assets of a minor's estate to pay any obligation imposed by law on the minor's natural guardian ... including ... support, maintenance, care ... of the minor" *without a court order upon a showing of extreme hardship.*[37]

Reading these statutes together, and in the absence of any guiding authority from the Kansas state courts, this Court concludes that when a minor's estate does not exceed $10,000, a natural guardian need not be appointed conservator in order to manage that estate for the minor's benefit and that a natural guardian is not deprived of the power to expend estate funds for his child's support. However, if the estate exceeds $10,000, the natural guardian must secure such an appointment before exercising control over the estate and, as a conservator, the natural guardian is prohibited from spending estate funds in this manner absent a court order issued upon a showing of extreme hardship.[38]

---

34. *See* p. 4, *supra.*

35. KAN. STAT. ANN. § 59–3078(a)(1).

36. KAN. STAT. ANN. § 59–3078(b)(1).

37. KAN. STAT. ANN. § 59–3078(f)(1) (Emphasis added.).

38. A natural guardian's authority under § 59–3053(a) is analogous to a parent custodian acting under the Uniform Transfers to Minors Act (UTMA), KAN. STAT. ANN. § 38–1701 *et seq.* (2000). The custodian is not subject to the direct supervision of the court in carrying out his duties under the UTMA. The custodian may use custodial property as the custodian considers advisable for the minor's benefit. *See* § 38–1715(a)(1). Like a natural guardian, when the custodian of UTMA property has a duty to support the child for whose benefit the property was transferred, the custodian has broad discretion to deliver property to the minor or pay her expenses, but "a delivery, payment, or expenditure under this section is in addition to, not in substitution for, and does not affect any obligation of a person to support the minor." *See* § 38–1715(c). *See Wilson v. Wilson,* 37 Kan. App.2d 564, 154 P.3d 1136 (2007) (There are no provisions in the Kansas UTMA prohibiting a parent custodian from using custodial property to pay expenses for the minor's benefit, even when the expenses are for necessities a parent is generally obligated to provide for his or her child. In fact, such expenditures are expressly authorized under K.S.A. 38–1714(a) and K.S.A. 38–1715(a)). *See also, In re Merrill, supra* at note 31.

Here, Troy Tatro had full custody and control of Mohr's settlements, although Mohr has not proven that, at any given time, Tatro had in excess of $10,000. Mohr was unaware of the existence of the 1998 settlement funds. She was not told the extent of the 2003 Wal–Mart settlement and was not privy to the manner in which Tatro spent those settlement funds. Tatro had a duty to manage these funds for Mohr's benefit. To the extent that he expended any of this money for her necessities or support, KAN. STAT. ANN. § 59–3053(b) makes clear that it is his property and estate, not hers, that is liable for her support during her minority. Still, because he never had more than $10,000 of Mohr's funds in his grasp, he was not required to seek the appointment of a conservator or to seek a specific court order authorizing him to do so. On this record, where there is no evidence that Tatro spent or took the funds for himself, he cannot be found to have committed a defalcation with respect to these funds.

Even if KAN. STAT. ANN. § 59–3053(b) should be read as a prohibition of Tatro's conduct, the evidentiary record would not support a finding that excepted this debt from discharge because this Court cannot tell how much Tatro spent on support and non-support items. The parties have stipulated that Tatro spent none of the money on himself. Under plaintiff's theory, Tatro's nonsupport expenditures would not be defalcations and only what he spent on Mohr's support would make up his non-dischargeable debt to her.

In *In re Conservatorship of Chapman,*[39] the Kansas Court of Appeals found that a father who reimbursed himself from conservatorship funds for court-ordered child support had violated his express duties as a conservator because he had done so without receiving court approval as the statute requires.[40] In *Chapman,* the father believed, based on an attorney's advice, that he could legally offset from conservatorship funds, moneys he had paid for child support. The trial court therefore found, and the court of appeals agreed, that Chapman had not converted the funds to his own use and therefore he was only liable for their return under KAN. STAT. ANN. § 59–3088 and not for the conversion penalty under KAN. STAT. ANN. § 59–1704.[41] Thus, even if there were evidence in the record that would enable this Court to liquidate the amounts that Tatro spent on support, Kansas law suggests that he would only be liable to Mohr to that extent and that the penalty provisions of KAN. STAT. ANN. § 59–1704 would not apply.

*Mohr's Action is Not Barred by KAN. STAT. ANN. § 60–513(a)(4)*

Tatro defends these claims alleging that collection of Mohr's debt would be barred by the applicable two-year statute of limitation, KAN. STAT. ANN. § 60–513(a)(2) or (a)(4), or the one-year statute of limitation, KAN. STAT. ANN. § 60–515(a). Subsection (a)(2) covers an action for taking, detaining, or injuring personal property while (a)(4) deals with an "action for injury to the rights of another, not arising on contract, and not otherwise enumerated." Subsection (a)(2) applies to conversion actions while (a)(4) applies to fiduciary breaches.[42] In this case, the parties stipulate that Tatro spent money from the 1998 settlement from 1998 until June 11, 2003. They also stipulate that Tatro spent the 2003 settlement over a period of time from

---

**39.** 36 Kan.App.2d 730, 144 P.3d 771 (2006).

**40.** *Id.* at 742, 144 P.3d 771.

**41.** *See* note 17, *supra.*

**42.** *Res. Trust. Corp. v. Scaletty,* 257 Kan. 348, 353, 891 P.2d 1110 (1995) (Section 60–513(a)(4) governed claim for breach of fiduciary duty); *Boyle v. Harries,* 22 Kan.App.2d 686, 923 P.2d 504 (1996).

June 11, 2003 through April 1, 2004. Thus, the alleged breaches of his fiduciary duty began in 1998 and continued through April 1, 2004, all during the period of Mohr's minority. But when did Mohr's cause of action accrue? [43]

KAN. STAT. ANN. § 60–513(b) makes clear that Mohr's causes of action against Tatro did not accrue until Tatro's actions "first cause[d] substantial injury", or "if the fact of injury is not reasonably ascertainable until some time after the initial act," until "the fact of injury becomes *reasonable ascertainable* to the injured party...." [44] Section 60–(b)'s accrual rules applied to tort actions, including causes of action for breach of fiduciary duty. [45]

The case law applying the accrual rules instructs that the date of the breach of the fiduciary obligation, standing alone, may be insufficient to trigger the statute of limitations. In *Bold v. Sitcaufsky* [46] the plaintiff minority shareholder alleged a breach of fiduciary duty by the majority shareholder by converting "convertible promissory notes" to shares of stock in their close corporation. In concluding that the fiduciary duty claim accrued when the defendant converted the notes to stock, rather than when the convertible notes were authorized or issued, the court stated:

> ... it is not fatal to plaintiff's lawsuit that the breach of duty occurred in September 1993. We say this because we have concluded that even if the breach of the fiduciary obligation occurred in September 1993, plaintiff's cause of action for damages did not "accrue" at that time. We conclude that plaintiff was not damaged in any substantial fashion by the breach in 1993 and did not, in fact, suffer substantial damage until the note was converted in May 1995.
>
> ... we will assume that the breach of fiduciary obligation occurred in September 1993. It is obvious that plaintiff knew, or should have known, that the breach of duty had taken place. However, that knowledge alone does not mean that the cause of action for breaching that duty accrued on the date of the breach.... It is the question of when injury first occurred on which we must focus. [47]

In *State, ex rel., v. Masterson,* [48] the State sued a former county treasurer to recover funds that were embezzled throughout the treasurer's term of office. There, the Kansas Supreme Court held

---

**43.** KAN. STAT. ANN. § 60–515(a) describes the effect of a person's minority on the running of the statute of limitations. It provides, in relevant part "... if any person entitled to bring an action ... *at the time the cause of action accrued or at any time during the period the statute of limitations is running,* is less than 18 years of age, ... such person shall be entitled to bring such action within one year after the person's disability is removed ..." Thus, if Mohr's cause of action had not accrued during her minority, the limitations period did not begin to run and the one-year statute of limitation in § 60–515(a) is inapplicable. *See Shirley v. Reif,* 260 Kan. 514, 920 P.2d 405 (1996) (K.S.A.60–515(a) requires minors to file claims which accrue during minority within 1 year after turning 18); *Lewis v. Shuck,* 5 Kan.App.2d 649, 623 P.2d 520 (1981) (in order for disability statute to toll statute of limitations, the disability must have existed at the time the cause of action accrued). As discussed in the text above, the Court concludes that Mohr's cause of action did not accrue during her minority.

**44.** KAN. STAT. ANN. § 60–513(b).

**45.** *Bold v. Spitcaufsky,* 24 Kan.App.2d 135, 942 P.2d 652, *rev. denied* 262 Kan. 959 (1997) (A cause of action for breach of fiduciary duty does not accrue until the act giving rise to the cause of action first causes substantial injury).

**46.** 24 Kan.App.2d 135, 942 P.2d 652 (1997).

**47.** *Id.* at 139–40, 942 P.2d 652.

**48.** 221 Kan. 540, 561 P.2d 796 (1977).

that the cause of action did not accrue until the treasurer failed to pay over the funds to his successor. While the treasurer violated his duty to the public by embezzling the funds, substantial injury did not occur until his term of office was completed and he failed to pay over the funds to his successor.

In *Bagby v. Merrill Lynch, Pierce, Fenner & Smith*,[49] the successor trustee of a trust sued the Merrill Lynch brokerage firm for *inter alia* breach of fiduciary duty as a result of its handling of a trust account. The former trustee of the trust misappropriated trust property by transferring funds in excess of $500,000 to the trustee's personal brokerage account. The brokerage firm moved to dismiss the claims contending that they were barred by the applicable statute of limitations. The Kansas District Court stated that "[f]or purposes of the tort claims, the key to the accrual of the claims is knowledge of the injury."[50] Whether an injury is reasonably ascertainable "carries with it an obligation to investigate available factual sources."[51] In circumstances where a fiduciary misappropriates or embezzles funds from the principal, the victim learns of her injury when she receives some information that her assets have been depleted. At that time, the victim has a duty to investigate and the tort claim accrues. The Court found in *Bagby*:

> In December 1993, Mrs. Klugg was made aware through the [trustee's]

bankruptcy proceeding that most of the assets she had entrusted to [the trustee] had disappeared. She further understood by at least January 1994 that some of her assets had been held by the defendant. At that point, plaintiffs' injury was reasonably ascertainable. Plaintiffs had a duty to investigate the cause of her loss and timely file an action within the applicable statute of limitations.[52]

Here, Mohr's financial injury could only begin, at the earliest, when Tatro began spending the money in 1998 in violation of his fiduciary duty. But, Mohr clearly was unaware of the existence of the 1998 settlement or that Tatro was spending the settlement funds in 1998. Mohr did not learn of the existence of the settlement funds until her 18th birthday, August 10, 2004, when she reached majority and became entitled to the money. This would have been the first time that Mohr's injury was reasonably ascertainable. She did not ask for the money until August 10, 2005, her 19th birthday, and only at that time did she discover information that led her to believe Tatro had received the 1998 settlement and spent some or all of the settlement money and could not account for it. Mohr suffered no injury, even after reaching majority, until Tatro refused to pay over the settlement funds or reimburse Mohr for those funds. The Court concludes that the two-year statute of limitations began to run, at the earliest, on August 10, 2004, the first time she could

**49.** 104 F.Supp.2d 1294 (D.Kan.2000).

**50.** *Id.* at 1298.

**51.** *Id.*

**52.** *Id.* at 1299. *See also Henrichs v. Peoples Bank*, 26 Kan.App.2d 582, 992 P.2d 1241, *rev. denied* 267 Kan. 888 (1999) (Cause of action based on the depletion of funds in bank account by holder of power of attorney began to accrue when named account holder and victim learned of her loss. When the account holder received information that her funds

had been depleted, a duty to investigate arose and the tort causes of action accrued.); *Boyle v. Harries, supra* (Minority shareholders in a corporation being manipulated against their interests by the majority shareholders could not have reasonably ascertained their injuries until the date they received an audit report from the company's auditors, even though these shareholders might have been able to ascertain individual actions on the part of the abusive majority.).

846

have reasonably ascertained the existence of the settlement funds and the fact of an injury by Tatro and, at the latest, in August of 2005, when she asked for the settlement money and Tatro refused her request. Under either accrual date, Mohr's state court action, filed on April 25, 2006, was filed within two years and is not time-barred.

*Tatro Has Accounted for His Expenditures*

The Court received little definitive evidence about the manner in which Tatro spent the funds, other than his affidavit, made in the state court case, that he expended the $12,146.20 he received on account of her tort settlements on "her day-to-day needs as well as her desires" and the parties' stipulation to that effect. He did state that he "provided her a motor vehicle, having a value of approximately $6,000." As noted above, this differs significantly from Mohr's trial testimony. The only other itemized expenditures evident from the record are Tatro's purchase of a class ring, prom dress, and senior pictures for Mohr, payment of her cell phone bill, and the Dallas trip. These expenditures are neither necessities nor support. And there was no evidence introduced showing the amount spent on each item. In short, the Court cannot ascertain from the evidence what amount was spent on support or necessities.

Mohr demonstrated the existence of a fiduciary duty on Tatro's part. However, in light of this Court's reading of the applicable Kansas statutes, Mohr failed to make a prima facie case that Tatro violated that duty by using the settlement funds to pay his obligation of support (which is stipulated), and the burden to account for these expenditures never shifted to Tatro.[53] Even if it had, the parties stipulated that all the money was spent on Mohr's needs and wants, but there is no evidence as to how much was spent for support.

In short, on the record before it, this Court cannot conclude that Troy Lee Tatro committed a defalcation while acting as Ashlee Mohr's natural guardian. Therefore, he owes her no debt that may be excepted from his discharge.

Judgment shall therefore be entered for Troy Lee Tatro on the complaint and the same is dismissed, costs to be taxed to the plaintiff. A Judgment on Decision will issue this day.[54]

---

**53.** *Newton v. Hornblower, Inc.,* 224 Kan. 506, 582 P.2d 1136 (1978) (In setting of unauthorized expenditures of corporate funds, court stated that where fairness of transaction involving fiduciary relationship is challenged, the burden of proof is on the fiduciary to establish the fairness of the transaction and show his good faith; once plaintiff put unauthorized expenditures in issue, defendant-fiduciary bore the burden of justifying the expenditures.); *Richards v. Bryan,* 19 Kan. App.2d 950, 879 P.2d 638 (1994).

**54.** On March 3, 2008, plaintiff filed a Motion to Strike the defendant's second trial brief filed on February 27, 2008 (Dkt. 40). The Motion is DENIED.